

(https://minnesotalawreview.org/)

# Minnesota Law Review (https://minnesotalawreview.org/)

# STOPPING GAMESTOP'S "GAMESTONK": WHY COURTS MUST CONFRONT GAMESTOP COLLUDERS AND PROHIBIT OPEN-MARKET MANIPULATION

February 3, 2021

**By: Casey Epstein, Vol. 105 Note & Comment Editor**

## INTRODUCTION

Throughout January and into February, online traders frantically purchased GameStop stock, driving the down-on-its-luck company's stocks into the stratosphere.[1] The GameStop investors—primarily small-scale Reddit users—have openly colluded against large hedge funds with short positions against GameStop.[2] The result: Many large hedge funds have lost humongous capital betting against GameStop and many small-scale investors have realized windfall gains.[3]

While many casual readers are likely cheering for the small-scale investors to triumph over the hedge funds—a classic David versus Goliath story—the actual ramifications of the GameStop proponents are more complicated. The GameStop stock buyers have openly worked together to manipulate the stock market, driving GameStop stock into blatantly absurd heights.

While this strategy is clearly effective, it comes with significant economic and social costs. Market efficiencies and resource allocation benefits of the stock market evaporate and consumer confidence in the stock market as a useful instrument that roughly represents companies' actual financial value plummets. Without consequences, the GameStop investors will repeat their strategy, harming the public in the process.

It is imperative the courts step up to the challenge. The judiciary must stop condoning open-market manipulation and switch to prohibiting such intentional and financially harmful acts from both behemoth hedge funds and small-scale redditors. Without swift action, the stock market could devolve into a chaotic casino, undermining any useful value that stocks provide.

## I. THE GAMESTOP STOCK ROCKET

GameStop, the brick-and-mortar videogame retailer, has financially struggled since 2015.[4] That GameStop was doing poorly should be no surprise—online retailers, like Amazon, and instantly downloadable videogame websites, like Steam, can sell the same games more cheaply and conveniently.[5]

In August, 2020, a well-known investor[6] purchased a large share in GameStop and issued a public letter advocating for corporate reforms.[7] This open letter garnered significant press and launched GameStop into a "cult stock" with a subset of Reddit users via the r/WallStreetBets subreddit.[8]

Institutional investors, including Citron Capital, were skeptical of any real change in the financials behind GameStop, believing instead that GameStop's modest stock increases were solely due to investor's presence.[9] These investment firms began massively shorting GameStop, betting that the company's good fortune was only temporary.[10]

Reddit users organized a short squeeze[11] on these financial institutions,[12] posting, for example, guidelines titled "Bankrupting Institutional Investors for Dummies, ft GameStop,"[13] which advocated pumping the stock to short squeeze the investors.

Remarkably, the short squeeze worked, with GameStop stock skyrocketing and institutional investors with short positions suffering heavy losses. GameStop's stock, which sat at less than $20 per share at the start of January,[14] closed at $325 per share at the end of January,[15] a more than 1,500% increase.[16] Institutional short sellers, many of whom have closed out their positions (realizing losses on their apparently misguided bets), have lost over $19 billion dollars.[17] One Reddit user, "Roaring Kitty," who has been at the forefront of egging on redditors to purchase GameStop stock, invested $53,000 early in GameStop options, and has made a whopping $48 million—more than nine hundred times his initial investment.[18]

On January 28, Robinhood, the financial service that redditors use to purchase stocks, limited trading in GameStop, suddenly and unilaterally ceasing a significant amount of GameStop trading.[19] Robinhood's decision was swiftly met with anger. Reddit users lambasted Robinhood's decision.[20] Even Democrats *and* Republicans agreed to denounce Robinhood's ban on trading; Representative Alexandria Ocasio-Cortez called Robinhood's decision "unacceptable"[21] and Senator Ted Cruz tweeted that he "[f]ully agree[d]" with her.[22] Senator Elizabeth Warren wrote to the SEC, describing redditors' GameStop rally as "just the latest indication that many private equity firms, hedge funds, and other investors, big and small, are treating the stock market like a casino."[23] Senator Warren later called on the SEC to "grow a backbone" to regulate the securities market.[24]

At this point, it is still unclear how the GameStop—or "GameStonk!!"[25]—saga will end.[26] However, it seems likely that the institutional investors who have already suffered heavy losses will not be the only losers. There is little chance that GameStop's stock is properly valued at over $300 per share. GameStop's descent back down from the moon—which will happen eventually—will likely create its own new set of losers.[27] Also likely is that the furious stock climb and corresponding stock furor will change investing in the future—how exactly remains to be seen.

## II. SEC RULES FOR OPEN-MARKET MANIPLUATION

The SEC is tasked with promulgating and enforcing securities rules and regulations. Historically, Congress created the SEC to respond to the Great Depression, regulate securities markets, and prevent fraudulent and quasi-fraudulent stock market manipulations. Courts, however, are unclear on whether the SEC—and its favorite enforcement tool, Rule 10b-5—prohibit facially legal market manipulation, termed "open-market manipulation." Although courts are hesitant to impose liability for facially legal market manipulations, there are strong policy rationales favoring enforcing such liability.

### A. The Securities and Exchange Act of 1934

The Securities Exchange Act of 1934[28] ("SEA") responded to rampant securities misinformation and outright fraud that led to the Great Depression.[29] Congress drafted the Securities Act broadly to combat market manipulation—especially the sort of market manipulation that led to the calamitous effects of the Depression.[30] Congress codified certain reasons for issuing the SEA, including a concern that "the prices of securities on []

exchanges and markets are susceptible to manipulation."[31]

The SEA established the SEC[32] and provided the agency with the broad power to promulgate rules prohibiting the use of "any manipulative or deceptive device" from affecting the securities market.[33] The extensive legislative history over the SEA "suggest[s] that section 10(b) was designed to give the SEC plenary power over the stock market."[34] The SEC responded by issuing Rule 10b-5, which has become the foundation for prosecuting financial misconduct.[35]

Rule 10b-5 is written primarily as an anti-fraud rule, although courts have expanded its reach beyond blatant fraud. The regulation prohibits individuals from using the securities market to "employ any device, scheme, or artifice to defraud," to "make any untrue statement of material fact," or to "engage in any act, practice, or course of business which would operate . . . as a fraud of deceit upon any person."[36]  Courts, in turn, have developed this rule into a six-element requirement, which importantly includes establishing "manipulative acts."[37]

### B. The Open-Market Manipulation Circuit Split

The key question is whether Rule 10b-5 captures "open-market manipulation." Open-market manipulation is accomplished "solely through the use of facially legitimate open market transactions."[38] In other words, the manipulator does not utilize misstatements, fraud, fictitious trades, or deceit; "the transactions are permissible and involve no objectively bad acts."[39]

For example, multiple parties can work together without resorting to fraud or misrepresentations to artificially manipulate the price of stock for their benefit. Assume that Person A owns 100 shares of Company X. Person A wants to sell his shares of X, which are currently trading at $45 per share, but A only wants to sell his shares for $50/share. Person A calls his friend, Person B, and suggests that B purchase a large quantity of shares in X. Person B complies, pushing the share price of X to rise to $50, and then A sells his 100 shares for $5,000—$500 more than A would have earned without B's help.[40] Economies of scale—i.e., owning lots of stock in a company—can turn manipulation of even just the change of 1 point or less in a stock into a massive windfall.

Ultimately whether such open-market manipulation violates Section 10b turns on what constitutes a "manipulative act."[41] In the 1970s and 80s, the Supreme Court issued decisions emphasizing that the scope of Section 10b is limited to fraud and deception.[42] However, these decisions did not clearly articulate that it was never possible for facially legal securities transactions to violate Section 10b.[43] Legal scholars have attacked the Court's decisions as failing to reckon with the original broad purpose of the SEA.[44] This ambiguity created "a sharp circuit split" over whether open market manipulation could ever violate 10b-5.

Some courts strictly hold that no facially legal securities trades—even where those trades clearly manipulate the market—can create legal liability for the traders.[45] The Third Circuit held that "regardless of whether market manipulation is achieved through deceptive trading activities or deceptive statements as to the issuing corporation's value, it is clear that the essential element of the claim is that *inaccurate* information is being injected into the marketplace."[46] Similarly, the Second Circuit rejected a 10b-5 prosecution case in *Mulheren*,[47] noting in dicta that "[n]one of the traditional badges of manipulation are present in this case [as defendant] conspicuously purchased the shares . . . in the open market."[48]

Other courts disagree with such a strict analysis, rightly noting that traders can manipulate the market without fraud or misrepresentations. The D.C. Circuit held that even "real" trades "can be illegal solely because of the actor's purpose."[49] Interestingly, the D.C. Circuit concluded that open market

manipulation could constitute 10b-5 liability based on the *Chevron* administrative doctrine, which compels the courts to accept agencies' reasonable statutory interpretations.[50] Notably, The D.C. Circuit is the consensus expert in all things administrative law.[51]

### C. Rationales for Prohibiting Open-Market Manipulation

There are a number of compelling reasons for courts to follow the D.C. Circuit's footsteps in clearly prohibiting open-market manipulation—at least in certain circumstances. First, as the D.C. Circuit stated in *Markowski*, the SEC has the power to interpret its own statutes and the judiciary should give the agency deference to do its job.[52] This interpretation comports with the broad discretion that the SEA's framers believed that the administering agency should enjoy.[53]

Beyond administrative rationales, however, there are strong market considerations militating in favor of prohibiting open-market securities manipulation. Purposeful market manipulation, even if facially legal, "acts as a kind of informational pollutant, making stock prices noisier signals of actual value."[54] The stock market helps to allocate scarce economic resources in the most efficient way possible; distorted market prices reduce this efficiency.[55]

And besides pure economic principles, market distortion has a less-measurable but arguably larger impact still: harming market confidence.[56] Informational pollution increases market volatility, suggesting that stock prices are artificial and further eroding market confidence.[57] Distortions in the market, even without clear manipulation, reduce consumer confidence that the market is fair—similar criticisms have been rampant throughout the pandemic.[58] However, perceptions that the market is unfair skyrocket when investors blatantly and purposely manipulate the market to their own benefit.[59]

Finally, refusing to hold market manipulators accountable notwithstanding their facially legitimate trades exacerbates all of the negative traits described above. Where traders know that they can manipulate markets without consequence, so long as they manipulate the market "properly," courts implicitly *incentivize* such market manipulation. Rather than staunching the financial bleeding from unreliable, manipulated markets, judicial inaction gives traders the green light to continue manipulating markets via open-market manipulation—allowing knowledgeable and well-resourced traders to get rich at the public's expense.

This Post does not intend to pick on or denigrate small-scale investors, but rather to highlight the problem of blatant stock collusion and open-market manipulation. Wealthy individuals too can openly manipulate the market for their own benefit. Elon Musk, for example, is a frequent social media user whose Tweets often bump the companies he promotes.[60] On January 7, 2021, Musk curtly Tweeted out: "Use Signal."[61] The market cap for Signal, the encrypted messaging app, jumped from $7 million to $659 million in less than a week.[62] On the same day that Musk Tweeted "GameStonk!!" he also Tweeted "I kinda love Etsy."[63] Etsy Inc.—the e-commerce handmade and vintage goods site—saw an immediate 8.6% jump.[64] While it is unclear whether Musk or his friends owned stock in Signal or Etsy at the time of his Tweets, Musk's simple social media statements illustrate how easy it is for wealthy and/or influential individuals to manipulate the stock market for their own gain. For what it's worth, Musk has gotten into hot water with the SEC before.[65]

Ultimately, the problem of open-market manipulation goes far beyond small-market Reddit users—virtually anyone with internet access and a hunch can manipulate the market. Courts need to devise a better solution to these attempts at manipulation than just having the SEC censor Elon Musk's Twitter account.

## III. COURTS SHOULD HOLD THAT REDDITORS' GAMESTOP OPEN-MARKET MANIPULATION—AND OPEN-MARKET MANIPULATION GENERALLY—VIOLATES RULE 10B-5

Sections I and II make three things clear: First, redditors and other GameStop stock purchasers are intentionally manipulating the market—either to sink hedge funds, to make money, or both. Second, such a scheme clearly constitutes purposeful or open-market manipulation of the stock market. Third, this casino-style "investing" in GameStop and similar corporations harms the economy and the stock market, increasing market volatility and unpredictability, reducing market efficiency, and decreasing consumer confidence in the stock market, to name only a few negative consequences.

Another likely, yet unknown consequence, from the GameStop saga, is that there will ultimately be losers from "GameStonk."[66] While it seems fairly clear that many moneyed hedge funds lost their short bets (and billions of dollars), many, many small-scale investors are continuing to purchase stock in GameStop. Because the current GameStop prices are almost certainly vastly overvalued, at least some current stock purchasers will lose money as GameStop's stock falls back to reality. Whether this creates additional financial panic or harms small market investors who cannot afford to lose any money remains to be seen.

Regardless of who ultimately loses and how badly they lose, the GameStop saga demonstrates that open-market manipulation is bad for the economy and should not be tolerated. Luckily, the courts can easily rectify this problem by adopting the D.C. Circuit's interpretation of 10b-5[67]—or any of a number of scholars well-reasoned standards[68]—to hold that open-market manipulation is still violative market manipulation.

So far all the SEC has done is to tepidly state: "we will act to protect retail investors when the facts demonstrate abusive or manipulative trading activity that is prohibited by federal securities laws. Market participants should be careful to avoid such activity."[69] Neither large Wall Street firms nor small-market Reddit users should be allowed to openly manipulate the market without fear of consequences, especially not under the eggshell-thin aegis of mere "facially legally" transactions. Entities and actors who wish to openly manipulate the stock market need to be held accountable to ensure that bad-intentioned persons do not feel comfortable manipulating the market.

The SEC and courts should certainly not target small-scale investors. Rather, if the SEC needs to target anyone, it would probably be wealthy individuals who can more easily influence the market on their own and better hide their transactions. However, when large groups of small-scale investors do openly collude to purposefully influence the market, they too should be held to account. If the SEC fails to carry out its duty and enforce the rules against manipulative traders, then groups will continue to collude to manipulate the market for their own profit and without fear of repercussions. This would be a terrible result for investors, a terrible result for ordinary traders, and, most of all, a terrible result for the American public.

## CONCLUSION

January's frenetic trading of GameStop shares constitutes overt market manipulation—manipulation that the courts, in general and without good reason, have determined is not illegal because it is not deceptive. "GameStonk" has demonstrated the untenability of requiring fraud to prove illegal market manipulation. The SEC and the courts must move swiftly to curb this casino-style trading and impose penalties and otherwise disincentivize traders for conducting similar open-market schemes in the future. Allowing internet users (and others) to continue openly manipulating the market would create a cascade of poor results for all Americans.

[1] *See, e.g.*, Matt Levine, *GameStonk Rocket Rocket Rocket*, Bloomberg (Jan. 27, 2021), https://www.bloomberg.com/opinion/articles/2021-01-27/reddit-driven-surge-puts-gamestop-and-ryan-cohen-in-a-weird-spot [https://perma.cc/9PMZ-55MN].

[2] *E.g.*, Matt Levine, *The GameStop Game Never Stops*, Bloomberg (Jan. 25, 2021), https://www.bloomberg.com/opinion/articles/2021-01-25/the-game-never-stops?sref=1kJVNqnU [https://perma.cc/7LQB-WAYY]; *see generally* WallStreetBets, Reddit, https://www.reddit.com/r/wallstreetbets/ [https://perma.cc/W8MA-HREA].

[3] *E.g.*, Keith Griffith, *GameStop Winners and Losers: How Small 'Wolves of Reddit' Investors Are Now Millionaires on Paper and 'Roaring Kitty' Is Up $31M – While Hedge Funds Face $19B in Losses*, Daily Mail (Jan. 29, 2021), https://www.dailymail.co.uk/news/article-9203101/GameStop-winners-losers-Small-Reddit-investors-hedge-funds-face-19B-losses.html [https://perma.cc/N4ZF-X7V5].

[4] *See* Timothy Green, *Why Shares of GameStop Corp. Tumbled 24% in November*, Motley Fool (Dec. 9, 2015), https://www.fool.com/investing/general/2015/12/09/why-shares-of-gamestop-corp-tumbled-24-in-november.aspx [https://perma.cc/3RKP-EC7K].

[5] *See* Alex Kirshner, *What the Hell is Going on with GameStop Stock?*, Slate (Jan. 26, 2021), https://slate.com/technology/2021/01/gamestop-reddit-wallstreetbets-gme.html [https://perma.cc/Q2UM-GYQB].

[6] Named Ryan Cohen.

[7] *See id.*

[8] *See* Bailey Lipschultz, *GameStop Record Run Gives Win to Reddit Army in Citron Clash*, Bloomberg (Jan. 22, 2021), https://www.bloomberg.com/news/articles/2021-01-22/gamestop-tug-of-war-gives-reddit-army-a-win-on-record-volatility?sref=1kJVNqnU [https://perma.cc/AT2W-HH7A]. Reddit users have turned other stocks, including AMC movie theaters, Bed Bath & Beyond, and Blackberry cellphones, into similar cult stocks. *See* Jonathon Garber, *Proving GameStop Manipulation Will be Tough for SEC, Others*, FoxBus. (Jan. 30, 2021), https://www.foxbusiness.com/markets/proving-manipulation-gamestop-stock-will-be-tough [https://perma.cc/2WTR-8D4K].

[9] *Cf.* Emily Stewart, *The GameStop Stock Frenzy, Explained*, Vox (Jan. 29, 2021), https://www.vox.com/the-goods/22249458/gamestop-stock-wallstreetbets-reddit-citron?fbclid=IwAR1If3ANoY7Jq8MgEr67J4iTztXI__R2EcHwr1SvQOSrw4dbdpWoTPpSouU [https://perma.cc/3MEG-T3EX].

[10] *See* Kirshner, *supra* note 5. Shorting or short selling is where an investor borrows a stock and immediately sells the stock; then the investor later buys the stock back and returns it to the lender. *See* Brian Beers, *How an Investor Makes Money Short Selling Stock*, Investopedia, https://www.investopedia.com/ask/answers/how-does-one-make-money-short-selling/#:~:text=Short%20selling%20is%20a%20fairly,sell%20will%20drop%20in%20price [https://perma.cc/3KKK-JTCD]. A short seller bets that a given stock will decrease in value; the short seller will pocket the difference between their initial purchase price and the ultimate sale price.

Note, however, that short sellers have essentially unlimited financial exposure. If a short seller purchases a stock at, for example, $10 and the stock increases in value, the short seller must buy back the stock at a higher value and realize losses based on this difference in order to satisfy their debts. Because there is no limit to how high a stock's value can reach, there is no limit to a short seller's exposure.

[11] A short squeeze is where investors target short sellers, attempting to drive up stock prices in order to force those traders to sell their positions at a loss to

forestall greater financial exposure should the stock keep rising. *See* Cory Mitchell, *Short Squeeze*, Investopedia, https://www.investopedia.com/terms/s/shortsqueeze.asp#:~:text=What%20Is%20a%20Short%20Squeeze,pressure%20on%20the%20stock's%20price [https://perma.cc/FUC4-7LE3].

[12] *See* Kirshner, *supra* note 5.

[13] u/Player896, *Bankrupting Institutional Investors for Dummies, ft GameStop*, Reddit (Sept. 19, 2020), https://www.reddit.com/r/wallstreetbets/comments/ivs6dw/bankrupting_institutional_investors_for_dummies/ [https://perma.cc/V698-783F].

[14] *See GameStop Corp. (GME)*, Yahoo! Fin.,  https://finance.yahoo.com/quote/GME/chart [https://perma.cc/ZBF8-KTGN].

[15] *Id.*

[16] Harry Robertson, *Short-Sellers Are Nursing Estimated Losses of $19 Billion in 2021 After Betting on GameStop's Stock to Plunge*, Bus. Insider: Mkt. Insider (Jan. 30, 2021), https://markets.businessinsider.com/news/stocks/short-sellers-sitting-on-19-billion-of-losses-on-gamestop-data-shows-2021-1-1030020684 [https://perma.cc/TB4R-YUKF].

[17] *Id.*

[18] *See* Nathaniel Popper & Kellen Browning, *The 'Roaring Kitty' Rally: How A Reddit User and His Friends Roiled the Markets*, N.Y. Times (Jan. 29, 2021), https://www.nytimes.com/2021/01/29/technology/roaring-kitty-reddit-gamestop-markets.html [https://perma.cc/3AMX-DLJ7].

A call option gives the owner the right, but not the obligation, to buy a given stock at a specified price within a specific time period. *See* Jason Fernando, *Call Option Definition*, Investopedia, https://www.investopedia.com/terms/c/calloption.asp [https://perma.cc/RCR2-C34N]. Essentially, an option allows the owner to purchase stock in the future at its current price if the price goes up, or else let the option lapse if the prices decrease. Thus, if one owns an option to purchase ten shares of a given stock for $5 in one year, and the stock price rises to $15 per share, that option holder may still purchase the stock for just $5. Exercising their option would thus net the user $10 of gain per share.

[19] *See* Avie Schneider, *Game Back On: GameStop Stock Rebounds as SEC Warns Against Market Manipulation*, Nat'l Pub. Radio (Jan. 29, 2020), https://www.npr.org/2021/01/29/962047287/game-back-on-gamestop-stock-rebounds-as-sec-warns-against-market-manipulation [https://perma.cc/8LE9-WG28].

[20] *Id.*

[21] Alexandria Ocasio-Cortez (@AOC) Twitter (Jan. 28, 2021), https://twitter.com/AOC/status/1354830697459032066 [https://perma.cc/H89G-9JSN].

[22] Ted Cruz (@TedCruz) Twitter (Jan. 28, 2021), https://twitter.com/tedcruz/status/1354833603943931905 [https://perma.cc/7GSV-XQLF].

[23] Elizabeth Warren, Senator, Letter to Allison H. Lee, Acting Chair, SEC (Jan. 29, 2021), https://www.warren.senate.gov/imo/media/doc/01.29.2021%20Letter%20from%20Senator%20Warren%20to%20Acting%20Chair%20Lee.pdf [https://perma.cc/XDC8-A8Q5].

[24] Grace Dean, *Elizabeth Warren Told the SEC to 'Grow a Backbone' and Regulate Hedge Funds in the Wake of the GameStop-Wall Street Saga*, Bus. Insider (Feb. 1, 2021), https://www.businessinsider.com/warren-sec-regulation-gamestop-wall-street-securities-exchange-commission-2021-2

[https://perma.cc/E65Q-8N8C].

[25] Elon Musk (@elonmusk) Twitter (Jan. 26, 2021), https://twitter.com/elonmusk/status/1354174279894642703 [https://perma.cc/9REA-LM92].

[26] *See* Alex Kirshner, *All the Ways the GameStop Roller Coaster Could End*, Slate (Jan. 28, 2021), https://slate.com/technology/2021/01/gamestop-stock-gme-how-it-ends.html [https://perma.cc/XTZ8-9VQV].

[27] A number of redditors are posting on r/WallStreetBets that they have suffered massive losses, yet are waiting to sell ("holding") in hopes that the stock rockets back up. *See, e.g.*, u/anizzzzs, *Down $400k, I WILL HOLD! [diamond emoji] [hands up emoji]*, Reddit: r/WallStreetBets (Feb. 2, 2021), https://www.reddit.com/r/wallstreetbets/comments/lb2vle/down_400k_i_will_hold/ [https://perma.cc/U45U-HE88].

[28] Securities and Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) (codified as amended at 15 U.S.C. § 78a *et seq.*).

[29] *See* Elisabeth A. Keller, *Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Act of 1934*, 49 Ohio State L.J. 329, 335, 338–39, 347–48 (1988).

[30] *See* Maxwell K. Multer, *Open-Market Manipulation Under SEC Rule 10b-5 and its Analogues: Inappropriate Distinctions, Judicial Disagreement and Case Study: FERC's Anti-Manipulation Rule*, 39 Sec. Reg. L.J. 97, 100 (2011); Keller, *supra* note 29, at 335, 348.

[31] 15 U.S.C. § 78b(3).

[32] Securities and Exchange Commission.

[33] 15 U.S.C. § 78d(a); §78j(b).

[34] Steve Thiel, *The Original Conception of Section 10(b) of the Securities Exchange Act*, 42 Stan. L. Rev. 385, 461 (1990).

[35] Merritt B. Fox, Lawrence R. Glosten, & Gabriel V. Rauterberg, *Stock Market Manipulation and its Regulation*, 25 Yale J. Reg. 67, 118 (2018).

[36] 17 C.F.R. § 240.10b-5(a)–(c).

[37] Onel v. Top Ships, Inc., 806 Fed. App'x. 64, 66 (2d Cir. 2020) (quoting ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007)) (internal quotation marks omitted). The full six-part test states: "[A] plaintiff must allege: (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendants use of the mails or any facility of a national securities exchange." *Id.*

[38] Multer, *supra* note 30, at 98.

[39] Gina-Gail S. Fletcher, *Legitimate Yet Manipulative: The Conundrum of Open-Market Manipulation*, 68 Duke L.J. 479, 501 (2018).

[40] This example simplifies the case of *United States v. Mulheren*, where a market trader, John Mulheren, assisted banker Ivan Boesky and corporate raider Carl Icahn in pushing the shares of Gulf & Western Industries from $44.75 per share to $45 per share. 938 F.2d 364 (2d Cir. 1991). While the Second Circuit ultimately held that Mulheren did not violate Section 10b, other commentators have argued that his actions clearly constitute malevolent market

manipulation. *See* Fletcher, *supra* note 39, at 510–11.

[41] *See Onel*, 806 Fed. App'x. at 66.

[42] Chiarella v. United States, 445 U.S. 222, 234–35 (1980) ("Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud."); *see* Fox et al., *supra* note 35, at 118.

[43] Fox et al., *supra* note 35, at 118–19.

[44] *See* Thiel, *supra* note 34, at 461 ("At the very least, the legislative history shows that the drafters intended to delegate considerably more regulatory power than is encompassed by the Supreme Court's conception.").

[45] *See, e.g.*, GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001).

[46] *Id.* at 205 (quoting *In re* Olympia Brewing Co. Secs. Litig., 613 F. Supp. 1286 (N.D. Ill. 1985)).

[47] The example at *supra* note 40 was based on this case.

[48] United States v. Mulheren, 938 F.2d 364, 370–71 (2d Cir. 1991) (citing United States v. Scop, 846 F.2d 135, 137 (2d Cir. 1988), *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988); United States v. Gilbert, 668 F.2d 94, 95 (2d Cir. 1981), *cert. denied*, 456 U.S. 946 (1982); United States v. Minuse, 114 F.2d 36, 38 (2d Cir. 1940)); *see also* Onel v. Top Ships, Inc., 806 Fed. App'x. 64, 67 (2d Cir. 2020) ("The market is not misled when a transaction's terms are fully disclosed." (quoting Wilson v. Merrill Lynch & Co., 671 F.3d 120, 129–30 (2d Cir. 2011)).

[49] Markowski v. S.E.C., 274 F.3d 525, 529 (D.C. Cir. 2001) (internal citation omitted).

[50] *Id.* (citing Section 9(a)(2) of the Securities Exchange Act, 15 U.S.C. § 78i(a)(2); Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984)).

[51] *See, e.g.*, John G. Roberts, Jr., *What Makes the D.C. Circuit Different? A Historical View*, 92 Va. L. Rev. 375, 388–89 (2006).

[52] *Markowski*, 274 F.3d at 529.

[53] *See* Thiel, *supra* note 34, at 461.

[54] Fox et al., *supra* note 35, at 101.

[55] *Id.*

[56] *Id.* at 102.

[57] *See* Fletcher, *supra* note 39, at 526–27.

[58] *See, e.g.*, Paul Krugman, *Stocks Are Soaring. So Is Misery*, N.Y. Times: Opinion (Aug. 20, 2020), https://www.nytimes.com/2020/08/20/opinion/stock-market-unemployment.html [https://perma.cc/AYB6-UQJ8].

[59] *See* Fox et al., *supra* note 35 at 102–103.

[60] *See, e.g.*, Maggie Fitzgerald, *Etsy Shares Jump 9 Percent After Elon Musk Tweets He 'Kinda Loves' It*, NBC News (Jan. 26, 2021), https://www.nbcnews.com/business/business-news/etsy-shares-jump-9-percent-after-elon-musk-tweets-he-n1255644.

[61] Elon Musk (@elonmusk) Twitter (Jan. 7, 2021), https://twitter.com/elonmusk/status/1347165127036977153

[62] Dion Rabouin, *Elon Musk Tweet About Signal Messaging App Sent Stock with the Same Name Flying*, Axios (Jan. 10, 2020), https://www.axios.com/stock-signal-advance-bubble-sign-d3c0f33b-7e7f-475b-b341-02377e1ed75d.html [[https://perma.cc/8MAG-CFQ8].

[63] Elon Musk (@elonmusk) Twitter (Jan. 26, 2021), https://twitter.com/elonmusk/status/1354027651468550144 [https://perma.cc/AVP5-GC23].

[64] Ryan Vlastelica, *Etsy Stock Jumps on Praise from Elon Musk After He Buys Gift for His Dog*, Bloomberg (Jan 26, 2021), https://www.bloomberg.com/news/articles/2021-01-26/etsy-pops-premarket-as-tesla-s-musk-tweets-praise-after-purchase [https://perma.cc/4FPD-D9LP].

[65] In 2018 Musk Tweeted that he planned to take Tesla private at $420 per share and already had funding secured. *See* Robert Ferris, *Tesla Weighs Taking Company Private, But No Decisions Yet*, CNBC (Aug. 7, 2018), https://www.cnbc.com/2018/08/07/tesla-stock-jumps-on-musks-tweet-that-he-is-considering-taking-compan.html [[https://perma.cc/F8K9-6Q2K]. Tesla shares unsurprisingly jumped ten percent after this announcement. *Id.* The SEC took issue with Musk promoting his own company and has since forced him to seek legal review before he posts material financial information about Tesla. Christine Wang, *Elon Musk Makes Deal With SEC Not to Discuss Tesla's Finances Without a Lawyer's Approval*, CNBC (Apr. 16, 2019), https://www.cnbc.com/2019/04/26/elon-musk-and-sec-reach-agreement-over-tesla-ceos-use-of-twitter.html [https://perma.cc/MJ4X-U3H2]. While compelling social media influencers to vet their Tweets with a lawyer prior to posting is one option, that approach seems unlikely to stop all abuses or to really control the open-market manipulation problem at all.

[66] *See supra* note 25 and accompanying text.

[67] *See* Markowski v. S.E.C., 274 F.3d 525, 529 (D.C. Cir. 2001).

[68] *See* Fox et al., *supra* note 35; Fletcher, *supra* note 39; Multer, *supra* note 30

[69] Allison H. Lee, Acting Chair, Hester M. Pierce, Comm'r, Elad L. Roisman, Comm'r, Caroline A. Crenshaw, Comm'r, *Statement of Acting Chair Lee and Commissioners Pierce, Roisman, and Crenshaw Regarding Recent Market Volatility*, SEC (Jan. 29, 2021), https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29 [https://perma.cc/X4X9-WM2U].

Posted in De Novo (https://minnesotalawreview.org/category/denovo/)

Tweet

Share

Share

*Minnesota Law Review*
229 19th Ave. South
Minneapolis, MN 55455

Tel: (612) 625-9330
Fax: (612) 624-5400
mnlawrev@umn.edu (mailto:mnlawrev@umn.edu)

Home (//www.lib.umn.edu/publishing) | Contact Publishing Services (//www.lib.umn.edu/publishing/contact-libraries-publishing) | My Account (//minnesotalawreview.org/wp-admin/)

Privacy (//www.lib.umn.edu/about/privacy) | Acceptable Use of IT Resources (//policy.umn.edu/it/itresources)

The copyright of these individual works published by the University of Minnesota Libraries Publishing remains with the original creator or editorial team. For uses beyond those covered by law or the Creative Commons license, permission to reuse should be sought directly from the copyright owner listed in the About pages.